## Lewis v. Lewis' Administrator et al.

(Decided May 6, 1930.)

228

JOHN ROSE for appellant.

BRUCE & BULLITT for appellees.

Opinion of the Court by Commissioner Stanley—Affirming.

"During the summer of 1927, a startling discovery was made in the marriage license and registry bureau of the Circuit court clerk's office in Jeffersonville, Indiana, just across the Ohio river from the city of Louisville. The records of that office showed that on June 24, 1927, by authority of a license issued on that day, a marriage ceremony was performed by a justice of the peace, whereby a woman was married to a man who (as is otherwise shown) had been dead for two and a half months when the marriage took place. The solution of this mystery is involved in the decision of this case."

Thus begins the opinion of the Honorable Lafon Allen, chancellor, from whose judgment this appeal is prosecuted. He determined that the record referred to was of a false marriage ceremony, and further that there was no marriage between the parties, the appellant, Lula Lewis, and Ezra Lewis, as she undertook to establish. The opinion so fairly presents the evidence on the primary issue of fact that we shall follow it closely, although limitations of space compel its abbreviation.

Ezra Lewis, who died on April 10, 1927, had about $5,000 in life insurance, the proceeds of which constitute the subject-matter of this litigation. It is a contest between the administrator of his estate and Lula Lewis,

who insists that she was married to Ezra Lewis for the third time on March 21, 1927, or about three weeks before he died. When the policies were issued, Lula Lewis was the insured's wife, and was designated as the beneficiary. Subsequently, on February 27, 1926, she was divorced, the decree ordering a restoration of the property each party had received one from the other, or "may have obtained directly or indirectly from or through the other during marriage in consideration or by reason thereof." This constituted a forfeiture or release of all interest in the insurance on her husband's life. This can hardly be questioned. Section 2121, Statutes; Section 425, Civil Code of Practice; Sea, Adm'r v. Conrad, 155 Ky. 51, 159 S. W. 622, 47 L. R. A. (N. S.) 1074, Ann. Cas. 1915C, 318; Schauberger v. Moerl's Adm'r, 168 Ky. 368, 182 S. W. 198, Ann. Cas. 1917C, 265; Prudential Insurance Company v. Orr's Adm'r, 174 Ky. 831, 192 S. W. 825.

We again quote from the chancellor's opinion:

"The story of the relations between Ezra Lewis and Lula Lewis falls naturally into two chapters, the first dealing with events up to March 21, 1927, the date of the disputed marriage, and the second with events occurring on and after that date. As to the first chapter, there is little dispute and no serious doubt as to what transpired. But the second chapter is full of obscurity and contains two conflicting stories, so that we have three narratives; first, the undisputed story of what took place up to March 21, 1927; second, Mrs. Lewis' story of what took place after that time; and, third, the Administrator's version of these later events."

The parties were first married in Jeffersonville, Ind., on April 3, 1920. This union lasted for a little more than four years; the wife on June 27, 1924, filing a suit for divorce. During the latter part of that period, early in 1924, Mrs. Lewis became acquainted with one J. B. Poole, who plays a conspicuous part in this drama, and who, in connection with the mystery of the post mortem marriage of Ezra Lewis, is frequently referred to as "the hatchet-faced man." Poole was then rooming with another young man named Shipley. About this time Mrs. Lewis separated from her husband. An intimacy grew up between these three persons and another young

woman by the name of Ollie Wright, who it appears was the particular friend of Shipley and an old acquaintance of Poole. The two women roomed together for a time. This situation developed before the filing of the suit for divorce by Mrs. Lewis, at the trial of which she testified to extreme cruelty on her husband's part over a period of three years or more, during which he used physical violence on several occasions and repeatedly threatened her life.

A divorce was granted Mrs. Lewis on October 25, 1924. A little more than four months later, on March 6, 1925, she remarried her former husband. They went to live at the home of her sister, Mrs. Crowe, where Poole was then living. Four months after this second marriage, on July 8, 1925, they again separated. Lewis left the Crowe house, but Mrs. Lewis continued there for about a year, during all of which time Poole lived in the same house. Their friendship ripened, and the intimacy grew to such an extent that during the year and a half following this second separation Mrs. Lewis and Poole went about a great deal together in the evenings, visiting various roadhouses and other resorts in the vicinity of Louisville. During the summer of 1926 Poole and his former roommate, Shipley, together with Mrs. Lewis and her former roommate, Ollie Wright, made an excursion to Niagara Falls, going and returning together.

Meanwhile Mrs. Lewis, on August 26, 1925, filed her second suit for divorce, in which she alleged that her husband had contracted and concealed from her a loathsome disease, to wit, syphilis. A divorce having been denied upon this ground because of the previous divorce obtained, she then amended her petition, and alleged that her husband was living in adultery with another woman. The second divorce was granted on this ground on February 27, 1926. Subsequent developments adduced in this record, as the chancellor says, make the testimony in the divorce action less reliable, to state it conservatively, than it appeared at the time. He observes that "they suggest that Mrs. Lewis and her friends, who are not strangers to the courts, were not very fastidious as to the means employed to procure a successful result in litigation in which they were interested."

One of the effects of the disease with which Lewis was afflicted is a swelling of the legs and feet, and it is shown that during February and March, 1927, he was

unable to work, and had serious difficulty in getting about at all. He was then living at the Railroad Y. M. C. A., where on March 11, 1927, Mrs. Lewis visited him. On that visit she became quite interested in his insurance. Two days after this visit Mrs. Lewis had him removed to the rooms occupied by herself and her sister.

A review of the first act of this drama is thus given by Judge Allen:

"The first chapter of the story, thus concluded, covers seven years of the lives of this couple, during which there were two marriages between them and two divorces occurring within a period of sixteen months; that is to say, they were divorced, remarried and divorced again in the period from October, 1924, to February, 1926. During this period Mrs. Lewis had publicly charged her husband, first with extreme cruelty and violence, including threats against her life; second, with contracting a venereal disease; and, third, with adultery. She appears to have borne up under these misfortunes with great fortitude so much so that her natural liveliness and love of pleasure were not impaired, but found an outlet in the round of gayety hinted at above. It is impossible to read this portion of Mrs. Lewis' history without concluding that she is a woman who takes life easily and finds her pleasure without great regard to the rules of conventional morality. And her career, both as principal and as a witness in matrimonial causes, suggests a certain laxity which tends to encourage suspicion as to the accuracy of her version of the events which constitute the second chapter of this story."

The sister to whose rooms the deceased had been taken was living apart from her husband, and during the period that Lewis was there, on late Saturday night, March 19th, she was arrested on a wararnt sworn out by her husband, charging her with adultery. Her trial took place on the following Monday, March 21st, and the day of that trial opens the second act of the drama.

The following narrative is given in the opinion as to the occurrences on the day which Mrs. Lewis claims she was lawfully married to her former husband, as dis-

closed by evidence introduced in her behalf on the trial of this case:

"On the morning of Monday, March 21, 1927, Mrs. Lewis accompanied her sister, Mrs. Jeffries, to the court of Squire Petty, where Mrs. Jeffries was to be tried upon the charge brought against her by her husband. The trial was postponed until a later day, at which time Mrs. Jeffries was acquitted. In this matter, Mrs. Jeffries was represented by Mr. John Rose, and, while attending court on the morning of March 21st, some conversation took place between Mr. Rose and Mrs. Lewis with regard to the risks involved in her continuing to live with Ezra Lewis while not his wife. Mr. Rose advised a marriage. Upon returning home, Mrs. Lewis suggested this to Ezra Lewis, and upon his giving his consent, she telephoned to her friend and comrade, Poole, at the place of his employment and asked him to call for them in a car and take them to Jeffersonville for the purpose of having the marriage performed. Poole complied and a party proceeded to Jeffersonville, consisting of Mrs. Lewis, Ezra Lewis, Poole, Mrs. Walls, another sister of Mrs. Lewis, who lives at Lebanon, Kentucky, but happened to be in Louisville on a visit, and Mrs. Walls' little girl six years old. Upon reaching Jeffersonville they went to the office of Magistrate Veasey. From the magistrate's office they went to the court house where, after written applications were made out and signed both by Mrs. Lewis and Ezra Lewis, a marriage license was obtained, and thereupon they returned to the magistrate's office, where they were married. Thereupon the magistrate gave them a 'Marriage Certificate,' which is filed as 'Defendant's Exhibit No. 1' with the second deposition of Mrs. Lewis. The party then returned to Louisville and Mrs. Lewis repaired to her place of employment, which she reached at about 3 o'clock in the afternoon.''

There is some conflict in the evidence as to Lewis' physical condition during the four or five weeks preceding his death, but the trial court found that, while his condition was very bad, and his power of locomotion

much impaired, yet he was able with assistance to leave the house and get into an automobile.

We again quote the chancellor:

"The physical condition of Ezra Lewis grew daily worse and ten days after the marriage he was removed to the Kentucky Baptist Hospital. The record of his admission to that institution shows that the person who made that record drew a circle around the letter 'M' printed on the card, which is the customary method of indicating that the person admitted is married. Ezra Lewis remained in the hospital for ten days or until April 10, 1927, when his death occurred.

"Within a day or two after the death of Ezra Lewis, Mrs. Lewis consulted Mr. Rose about collecting the insurance on his life. Mr. Rose advised her that her claim to the proceeds of these policies would not be recognized unless she disclosed her marriage of March 21st. This she was unwilling to do because her father had been opposed to her second marriage to Lewis and, it was supposed, would be even more opposed to a third marriage. At the suggestion of Mr. Rose, she then consulted other lawyers."

Mrs. Lewis consulted first one and then another attorney, each of whom sought to collect the insurance for her based upon the fact that she was named as beneficiary in the policies, and no mention was made of her last marriage. Mrs. Lewis testified that she told neither of these two lawyers about her marriage, although both of them advised her that her divorce had terminated her interest under the policies. During this period of time she called upon J. G. Wilkes, an officer of the Louisville & Nashville Railroad Company, who handles the business arising under the group insurance policy issued to the employees of that company, which, to the amount of $3,000 on the life of Ezra Lewis, is involved in this suit. She says she told Mr. Wilkes about her last divorce, but testifies that nothing was said about the third marriage. Mr. Wilkes, however, testified that she told him that she had been twice married and divorced; that at the time of Lewis' death she was engaged to be married to him again, and they were waiting for him to become strong enough to go through the marriage ceremony, but he died

before it could be performed. It was not until June 29,. 1927, when Mr. Rose, as attorney for Mrs. Lewis, wrote a letter with respect to this group insurance policy that any public avowal was made of a marriage on March 21st. As Judge Allen observes, it is well to note that the date of this public announcement of the marriage is just four days after the post mortem marriage of Ezra Lewis to Lula Lewis shown by the Jeffersonville records.

The chancellor analyzes and states his conclusions respecting this evidence as follows:

"Such is Lula Lewis' version of the events which transpired after March 20, 1927. Taking only the testimony of eye-witnesses, the story is irreproachable. Mrs. Walls and Poole, who claim to have witnessed the marriage, say that it took place on March 21, 1927, exactly as recounted above. There is no testimony by any such witness which contradicts it in any particular. While it is true that the officials in Jeffersonville who had to do with the issuance of marriage licenses and the performance of the ceremony do not corroborate the story, they do not contradict it. The testimony of these persons is merely to the effect that they have no recollection of such transactions, which is not unnatural in itself. The only inherent weakness in the story seems to be the concealment of the alleged marriage. The only reason given for this by Mrs. Lewis is the fear of her father's displeasure. This seems not very plausible, even with respect to the concealment during Ezra Lewis' life. It seems particularly inadequate to explain the concealment after his death. After that event, Mrs. Lewis had a very strong motive for confessing the marriage, since it would enable her to collect the proceeds of the insurance policies upon her husband's life. Those proceeds came to something more than $5,000.00, which was a very considerable sum of money to a person in her situation. She cannot have had any apprehension about being disinherited by her father, since there is no showing that he had any estate to be divided among his eleven children. It is hardly to be believed that her father, after Ezra's death, would have been seriously disturbed by knowledge of a marriage which could no longer affect adversely

his daughter's future and which would enable her to come into a substantial sum of money. I think, therefore, that her concealment of the marriage is bound to excite some surprise and even suspicion."

We come now to the third act of this drama, and to consider the evidence relating to what has been referred to as the post mortem marriage.

The administrator, who is a brother of Ezra Lewis, knew nothing of the alleged marriage in March until he was written on June 29th by Mrs. Lewis' attorney to that effect. It is shown that in Indiana there are ten different official steps taken in the procurement of a marriage license and the recording of its return, each of which leaves a footprint in the clerk's office. There was no single act of record of any marriage between these parties on March 21st, but all ten steps are regularly of record as of June 24th. The original application for the license, however, was missing. It alone was not to be found among the records of the office. The loss of this original paper which bore the signatures of the applicants is strikingly significant. The record of it shows that the applicants were of the same name, the same age, having the same parentage, the same occupation, and the same place of residence as these parties. There was also proven this pertinent and remarkable fact, that the entry of this marriage in the index had been crudely and clumsily altered by an insufficient erasure of the given names of Ezra and Lula Lewis and the substitution of other names. All records of this marirage of June 24th appear in their proper chronological and numerical order, occupying a position between other entries of the same date in such manner as to demonstrate conclusively that the transactions thus recorded occurred on that date. We again borrow from the chancellor:

"Any theory of coincidence of names, places of birth, date of birth, residence, occupation, parentage, etc., must of course be rejected. Mrs. Lewis professes entire ignorance as to these transactions of June 24th but surmises that this false record must have been procured by the Administrator to be made with a view to defeating her claim. This surmise is too fantastic to be entertained for a moment. So far as this record shows the Administrator, on June

24th, knew nothing whatever of Mrs. Lewis' claim that there had been a third marriage. He did know that she was claiming the proceeds of the insurance policies but it was only because she was named as beneficiary in them. The manufacture of evidence of a marriage on June 24th could have no effect upon that claim. Even if the Administrator had known prior to June 24th that Mrs. Lewis intended to claim that there had been a third marriage, the manufacture of the false record of a marriage in June would have been of little service to him. The absence of any trace of the marriage claimed to have been contracted in March would have afforded him all of the protection that he could reasonably desire. And, if the Administrator had procured the making of this false record in order to discredit Mrs. Lewis, he would never have attempted to conceal it by altering the index. I dismiss the theory that the Administrator perpetrated this fraud as utterly without probability.

"The Administrator's theory as to the June marriage is that Mrs. Lewis, having found that she could not collect the proceeds of the insurance policies without evidence that she was Ezra Lewis's wife at the time of his death, conceived a plan for manufacturing such evidence. Of course, the record of a marriage in June would be of no service to her but would, on the contrary, destroy her. But a certificate that she had been married in March would be of great value, and, according to the Administrator's theory, the only means of obtaining such a certificate was by going through the form of a marriage with someone who would impersonate Ezra Lewis and by inducing the person who celebrated the marriage to date his certificate back to March upon the plea that a record of the marriage as of that time would be required to save her from some embarrassment.

"However daring and even fantastic this plan may appear to be, there is some important evidence to support the Administrator's theory. Mrs. Lewis did have, and has filed in this record, a 'marriage certificate' dated March 21, 1927, and signed both by the Clerk and Magistrate Veasey. A 'marriage certificate' of this character is no part of the official record of marriage. It is a paper filled out by the

clerk or magistrate, at the request of the bride or groom, upon a printed form having many hymenial embellishments, such as a flock of cupids fluttering above a bridal couple standing at the altar, and is intended, not to be recorded anywhere, but to be kept by the person to whom it is issued. Some private revenue is derived from the issuance of these unofficial 'certificates.'

"The 'certificate' held by Mrs. Lewis is of this character. There are several items of evidence tending to show that it was not issued to her upon the date which it bears. The first is the mock marriage of June 24th, since this would have made it possible to obtain such an antedated certificate and no other tenable theory is advanced to explain that fraud. The second is the obvious attempt to conceal the official record of the June marriage by the alteration of the index. But the most important evidence on this subject is found in the depositions of Magistrate Veasey, of Wilmer T. Fox, a lawyer of Jeffersonville, and of Eugene N. Cochran, of counsel for plaintiff. Objection was made to the admission of this testimony but I think it was clearly admissible under the rule as to admissions of one conspirator against another. 2 Wigmore's Evidence, sec. 1079.

"Mr. Fox testifies that Magistrate Veasey told him the circumstances of the June marriage and of the issuance at that time of the 'marriage certificate,' dated back to March 21st. The statement made by Magistrate Veasey was that the man who represented himself as Ezra Lewis and whom he had married to Lula Lewis on the evening of June 24th, asked him to antedate the certificate because the woman he had married was pregnant 'and they didn't want the embarassment that might come from a marriage certificate dated at the time of the marriage.' Mr. Cochran recounts a conversation that he had with Magistrate Veasey in which the latter told him that at about 8 o'clock on the night of June 24th, this couple, giving the names of Ezra Lewis and Lula Lewis, filled out application papers before him, went with him to the clerk's house where the application was filed and the license issued, then returned to his office (or perhaps to his home), where the ceremony was performed; that the man was a 'hatchet-faced

sort of a man'; that at the request of the couple he gave them a marriage certificate dated March 21, 1927; that 'they explained that they were in some sort of trouble and wanted it dated back.' Mr. Cochran further says that at the time when Magistrate Veasey made this explanation to him, he showed him the original marriage license which was dated June 24, 1927, photostatic copy whereof is in the record.

"Magistrate Veasey was called upon to give his deposition upon three different occasions. In his first deposition, he suffered from an almost total eclipse of memory. He had taken the precaution of being represented by counsel and, when questions were asked him with reference to antedating marriage certificates, he declined upon advice of counsel, to answer, upon the ground that the answer might incriminate him. He invoked this privilege several times during the course of his examination."

In his second deposition, among other things, the magistrate identified a letter which he had written on July 27, 1927, to the Brotherhood of Railway Trainmen, which had issued one of the insurance policies here involved, in which he stated his conviction that the man represented to be Ezra Lewis at the ceremony on June 24th was an impostor and offering his services to "clear up matters as this woman was evidently trying to put over some fraudulent deal."

"In his third deposition, Magistrate Veasey was asked to identify his signature to the original certificate of marriage, dated June 24th. He was, as he had always been, a reluctant witness and could only be got to say that the signature 'looked like' his. Perhaps the most remarkable lapse of memory on the part of Magistrate Veasey occurred when he was asked about his conversation with Mr. Fox and Mr. Cochran, in which he had told them about performing the June marriage and dating the certificate back to March. He did not deny them but was merely unable to remember whether he had held such conversations or not, although the interview with Mr. Fox had taken place only a few days earlier and that with Mr. Cochran a few months earlier, an

incredible failure of memory in view of the startling nature of the subject discussed.

"The record is quite voluminous and I have not attempted to mention all of the evidence upon either side. There is, however, one group of witnesses called by Mrs. Lewis, whose testimony, I think, should be noted. There are three witnesses who testify that Mrs. Lewis showed them the marriage certificate dated March 21st before Ezra Lewis's death. Two of these witnesses are sisters of Mrs. Lewis, to-wit, Mrs. Grove and Mrs. Jeffries. The third is a Miss Reardon. This testimony, added to the testimony of another sister, Mrs. Walls, and of Poole, who claimed to have been eye-witnesses of the March marriage, makes a very strong case for Mrs. Lewis's claim. It is only with great reluctance and upon the strongest compulsion that I am brought to the conclusion that the testimony of these witnesses cannot be true."

There are other circumstances which support the contentions of the appellee. For example, Lewis's doctor found him in bed at 11 o'clock on the day of the alleged wedding—which was also the day of trial of Mrs. Lewis's sister that he did not attend—and not only did the doctor advise him to stay in bed, but expresses the opinion, "He must not have made the trip in fact." There is some other evidence tending to support the claim of the appellant, but of little probative value. It is shown, for instance, that on March 24th Ezra Lewis told one of his physicians that, if he should not be able to return to work and pay him, his wife "had some insurance policies or something like that," and would attend to paying his fee.

We therefore may adopt as being fully sustained the concluding paragraph of Judge Allen's opinion:

"This is a record full of dark places, only partially illuminated by the evidence. In those half-shadows dark figures seem to move in the performance of dark deeds. It is impossible to see through all of this obscurity or to determine exactly what was done or by whom it was done but the state of the marriage records in Jeffersonville, taken together with the admissions shown to have been made by Magistrate Veasey, make it impossible to believe that any marriage took place between Ezra Lewis and Lula

Lewis on March 21, 1927, or that she was his wife at the time of his death."

Other than the claim that the decision of the chancellor is contrary to the evidence, numerous technical grounds are submitted for a reversal of the judgment, most of which relate to questions of practice. The brief filed in support of these contentions exhibits much diligence and learning on the abstract propositions of law. Their applicability and most of the allegations of error might be conceded, yet the appellant could hardly have been prejudiced by them, for we are convinced that no other conclusion could have been reached than that which was ultimately arrived at by the trial court. Full consideration has been given to the points raised, but it is deemed unnecessary to discuss all of them.

The jurisdiction of the court of equity was and is questioned on the ground that the plaintiff had an adequate remedy at law, as he could have sued the insurance companies on the policy contracts, and recovered judgments if entitled to the proceeds; and also because the issue as to the third marriage on March 21st was a question of fact to be determined by a jury. It is to be remembered that the divestiture of the defendant's rights under these insurance policies was done in the divorce proceeding, which, of course, is purely cognizable in equity. As a part of the statutory law governing suits for divorce, we have section 425 of the Civil Code of Practice, directing that such an order of restoration shall be entered upon the granting of a divorce, and, further:

"The proceedings to enforce this order may be by petition of either party, specifying the property which the other has failed to restore; and the court may hear and determine the same in a summary manner, after ten days' notice to the party so failing."

Clearly, the instant suit was to enforce the order made in the divorce case, and is but the continuation or reopening of that proceeding. Sandusky v. Sandusky, 166 Ky. 472, 179 S. W. 415; Hawkins v. Northern Coal & Coke Company, 145 Ky. 118, 140 S. W. 48. The issue raised was whether the rights lost in that case had been restored to the divorced wife through a subsequent mar-

riage. As stated in the recent case of Eastland v. Robinson, 233 Ky. 403, 25 S. W. (2d) 1028, 1029:

> "It is a familiar doctrine that, where a court of equity has jurisdiction of a subject, it will comprehend within its grasp and decide all incidental matters necessary to enable it to make a full and final determination of the whole controversy and thus determine the litigation."

The jurisdiction of the chancellor was recognized in Anheier v. De Long, 164 Ky. 694, 176 S. W. 195, 198, Ann. Cas. 1917A, 1239. In that case a former husband sought the cancellation of certain deeds to his divorced wife under the terms of section 425. The case was tried in equity, and, with reference to the objection to action of the court in submitting to a jury the determination of the issue of fact as to whether the conveyances had been made to the wife for a valuable consideration or by reason of the marriage, the court said:

> "These issues of fact were of equitable cognizance, and, of course, could have been disposed of by the chancellor without the assistance of a jury; but we do not know of any rule of practice denying to the chancellor the right to submit an issue of fact in a case of purely equitable cognizance to a jury for the purpose of having the advice and assistance of the jury in its determination."

Moreover, the plaintiff sought injunctive relief through an order requiring the defendant to turn over to the administrator all money which she may have collected or might receive under the policies and to require her to execute all releases necessary to enable him to collect the proceeds. This relief was also claimed by the defendant, who sought a similar order; and, in addition, one directing the delivery to her of a certificate of insurance issued by the United States government to Ezra Lewis as a veteran, which she claimed was in the possession of plaintiff's counsel; and likewise prayed that she be adjudged to have been the lawful wife of Ezra Lewis at the time of his death; and for the removal of Herbert Lewis as administrator. There were therefore several issues cognizable in equity, and the case was properly so tried.

It is also contended that the appellant was entitled to have a jury pass upon the issue of fact as to whether or not she was married to the deceased on March 21, 1927, as she claims. An answer and counterclaim was filed by her on November 19, 1927, and an amendment on the 26th. Thereafter on December 3d, at the time the reply was filed, the defendant moved that the cause be transferred to the common-law docket for the purpose of having this issue determined by the common-law court and a jury. This being overruled, she moved for a trial of the issue out of chancery, which was also overruled.

We may pass by that portion of section 10 of the Civil Code of Practice providing that the motion to transfer shall be made at the time the defendant answers (Cf. Riffe & Jones v. McKinney Deposit Bank, 171 Ky. 757, 188 S. W. 755), for the reasons given above are sufficient to sustain the action of the trial court in this matter.

The granting of the prayer for an issue out of chancery was a matter resting in the discretion of the judge, as has been often stated. In this instance, the court heard the witnesses orally, and it cannot be said that he abused a sound discretion in declining the assistance of a jury to determine the fact which he was authorized to decide; the acceptance of the verdict being also discretionary. Anheier v. De Long, supra.

Other grounds upon which appellant's counsel claim the right to the proceeds of the insurance, if the court concludes there was no remarriage, are: (1) That Mrs. Lewis, named as beneficiary, had an insurable interest because she was living with Lewis as his wife at the time of his death; and (2) if she had no insurable interest, then she was entitled to the benefits because the insured himself had taken out the policies and paid the premiums. The last proposition may be disposed of with the suggestion of loss of those benefits by reason of the divorce. Of special application is Prudential Insurance Company v. Orr's Adm'r, supra.

On the first point it is true that in Western & Southern Life Insurance Company v. Webster, 172 Ky. 444, 189 S. W. 429, L. R. A. 1917B, 375, Ann. Cas. 1917C, 271, it was held that, where there had been a formal, though illegal, marriage, and for several years the parties were recognized generally as husband and wife, and the relation was such that it would justify a reasonable expectation of advantage or benefit from the continuance of the

insured's life, the pseudo wife had an insurable interest. However, it was further held that a judgment annulling the marriage as void ab initio terminated her insurable interest in his life. The relation of Lula Lewis and Ezra Lewis after she removed him to the home of her sister one month before he died, and the circumstances surrounding them are very different indeed. The facts of this case in that respect clearly do not warrant the court holding appellant entitled to the benefits of the insurance on the ground indicated.

We have written the opinion at length because of the unusual nature of the case and to demonstrate fully that no injustice is being done appellant by affirming the judgment, which is now done.

Judgment affirmed.

Whole court sitting.